UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

AJM RE HOLDINGS IX, LLC

                                                            Case No: _____

                        Plaintiff,

        - against -                                         COMPLAINT

BARODA PROPERTIES, INC. and
FAIZULMUNIR KAZI

                        Defendants.
-------------------------------------------------------------------X


        Plaintiff, AJM RE Holdings IX, LLC ("AJM" or "Plaintiff"), by its attorneys Sive, Paget

& Riesel, P.C., for its Complaint in the above-captioned action against Defendants Baroda

Properties, Inc. ("Baroda") and Faizulmunir Kazi ("Kazi") alleges as follows:

                                **NATURE OF THE ACTION**

        1.      Plaintiff brings this action to recover costs it incurred in conjunction with the

investigation and removal of hazardous substances, non-hazardous substances, and petroleum

from property located at 10 Henry Street (a/k/a 10 North Henry Street a/k/a 10 Commercial

Street), Freeport, New York (the "Property"), including costs for (i) the removal of hazardous

substance-containing drums and non-hazardous substance containing drums, (ii) the removal of

contaminated soil, (iii) the removal and replacement of a contaminated drywell and (iv) the

removal of residual fuel oil from an improperly abandoned underground storage tank ("UST")

and the lawful abandonment in place of such tank.

2.      Plaintiff owned the Property from August 31, 2013 to January 22, 2014.  At the time Plaintiff acquired the Property, it was a tax-delinquent parcel that Plaintiff subsequently restored to the tax rolls.

3.      Baroda was the owner and operator of the Property from July 2006 to on or about August 2013, during which period it disposed and/or released hazardous substances, non-hazardous substances, and improperly abandoned a UST containing residual petroleum on the Property.

4.      Kazi was the operator of the Property for the period of Baroda's ownership, from July 2006 to on or before August 2013, during which period he disposed and/or released hazardous substances, non-hazardous substances, and improperly abandoned a UST containing residual petroleum on the Property.

5.      After Plaintiff's acquisition of the Property, it investigated and removed hazardous substances, non-hazardous substances, and petroleum from the Property, including hazardous substances released on the Property during Baroda's ownership of the Property and petroleum contained in an improperly abandoned UST that was present on the Property during Baroda's ownership of the Property.

6.      Plaintiff brings this action for (i) costs of response pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq. ("CERCLA"), and (ii) damages pursuant to common law causes of action under New York law. Plaintiff has incurred a total of $154,219.48 in costs, fees, and/or damages in investigating and removing hazardous substances, non-hazardous substances, and petroleum. Plaintiff has been reimbursed $40,000.00 and has outstanding response costs of $114,219.48.

**PARTIES**

7.      Plaintiff AJM RE Holdings IX LLC is a limited liability company organized and existing under the laws of the state of New York, with its principal place of business at 2 Jericho Plaza, Suite 101, Jericho, NY 11753.

8.      On information and belief, defendant Baroda is a corporation organized and existing under the laws of the state of New York with its principal place of business at 71-24 35th Avenue, Jackson Heights, New York.

9.      On information and belief, defendant Kazi is the current principal of Baroda, residing at 34-45 69th St, 1st Floor, Woodside, New York.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §§ 9607(a), 9613(g)(2), and 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1367 (supplemental jurisdiction).

11.     This Court has personal jurisdiction over defendant Baroda, a company organized under the laws of the state of New York that maintains its principal place of business within this state.

12.     This Court has personal jurisdiction over defendant Kazi as he resides within the state of New York.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b) insofar as Baroda resides, may be found, and has its principal office in this District; Kazi

resides within this District; and the events, actions, and omissions giving rise to this claim have occurred in this District.

## FACTUAL ALLEGATIONS

### *Property Description and History*

14.     The Property is located at 10 Henry Street (a/k/a 10 North Henry Street a/k/a 10 Commercial Street) in the Village of Freeport, Nassau County, New York, identified as Section 55, Block 491, Lot 345 on the Nassau County Land & Tax Map.

15.     The Property is a 0.667-acre parcel developed with a U-shaped one-story warehouse building (with second floor mezzanine office space), with a courtyard area situated at the inner portion of the U-shape on the north central portion of the property along Commercial Street.

16.     On information and belief, the Property as it is presently developed was originally occupied as a vocational school circa 1969.

17.     On information and belief, the Property was owned and operated by a cosmetics company from 1983 to 2005; this company abandoned hazardous substance-containing drums on the Property.

18.     On information and belief, these hazardous substance-containing drums were left in plain view, both in the interior of the premises and in the exterior courtyard on the Property.

19.     Baroda acquired title in and to the Property at a mortgage foreclosure sale on or about July 21, 2006.

20.     On information and belief, at the time Baroda acquired title in and to the Property, the drums remained in plain view in the interior and exterior of the Property.

21.    On information and belief, when Baroda acquired the Property, the drums in the exterior courtyard of the Property were in fair to poor condition, having been exposed to the elements for a substantial period of time.

22.    On information and belief, some of these drums in the exterior courtyard were leaking substances into a nearby drywell on the Property during the time Baroda owned the Property.

23.    During the time Baroda owned the Property, Kazi maintained control over and held responsibility for the use of the Property.

24.    On information and belief, during the time Baroda owned the Property, Kazi was responsible for day-to-day operations of the Property.

25.    During the time Baroda owned the Property, on information and belief, Baroda took no action to address the hazardous substance-containing drums in the interior of the Property.

26.    During the time Baroda owned the Property, on information and belief, Kazi took no action to address the hazardous substance-containing drums in the interior of the Property.

27.    During the time Baroda owned the Property, on information and belief, Baroda took no action to address the hazardous substance-containing drums in the exterior courtyard of the Property.

28.    During the time Baroda owned the Property, on information and belief, Kazi took no action to address the hazardous substance-containing drums in the exterior courtyard of the Property.

29.     During the time Baroda owned the Property, on information and belief, Baroda took no action to address the ongoing release of hazardous substances from the drums into the nearby drywell on the Property.

30.     During the time Baroda owned the Property, on information and belief, Kazi took no action to address the ongoing release of hazardous substances from the drums into the nearby drywell on the Property.

31.     On information and belief, Baroda either improperly abandoned the UST on the Property or took no action to address the improperly abandoned UST containing residual petroleum on the Property.

32.     On information and belief, Kazi either improperly abandoned the UST on the Property or took no action to address the improperly abandoned UST containing residual petroleum on the Property.

33.     On information and belief, beginning in 2008, Baroda ceased to make mortgage payments and to pay property taxes on the Property as they became due.

34.     On or about July 18, 2012, NYSDEC opened Spill #1203757 for "unknown petroleum" on the Property.

35.     During the time Baroda owned the Property, Baroda received a Notice of Violation ("NOV") from the Village of Freeport dated July 24, 2012, for unsafe conditions within the interior of the Property.

36.     The State of New York subsequently filed a summons and complaint dated September 9, 2012 charging Baroda for failure to respond to the NOV order to clean up certain fifty-five-gallon drums containing "unknown substances" stored in "the interior of the premises" at the Property. The complaint noted that similar conditions existed in the exterior part of the

property involving the same type of containers, and that such matter had been referred to the New York State Department of Environmental Conservation ("NYSDEC").

37.     On information and belief, Baroda failed to respond to the NOV and failed to remove and properly dispose of the drums in the interior or in the exterior of the Property.

38.     Baroda later pled guilty to the failure to respond to the NOV and agreed to fines in the amount of five hundred dollars.

39.     Plaintiff acquired title in and to the Property via foreclosure of its municipal tax lien interest on August 31, 2013.

40.     Baroda was the record owner of the Property until Plaintiff took title to the Property.

41.     On information and belief, Baroda had abandoned the property on or before August 2013, leaving behind and in place the improperly abandoned UST containing residual petroleum and the hazardous and non-hazardous substance-containing drums in the interior and exterior of the Property.

42.     On information and belief, Baroda was the owner and operator of the Property from July 2006 to August 2013.

43.     On information and belief, Kazi was the operator of the Property from July 2006 to the date of abandonment, on or before August 2013.

44.     On information and belief, there were no parties other than Kazi and Baroda occupying or operating the Property while Baroda was owner.

45.     Plaintiff held title to the property until its lawful sale on January 22, 2014.

*Plaintiff's Investigation of the Property*

46.     On May 11, 2012, on behalf of Plaintiff, an Environmental Professional ("EP") of Velocity Consulting Incorporated ("Velocity") conducted a visual inspection of the Property as part of a Phase I Environmental Site Assessment ("Phase I"), which resulted in the discovery of approximately thirty abandoned metal and plastic fifty-five gallon drums outdoors in the Property's courtyard.

47.     The Velocity EP noted in its Phase I report that the drums ranged from fair to poor condition; some of the drums were rusted and bulging and others appeared to be fire damaged.

48.     The Velocity EP further observed that the asphalt area surrounding the drums was stained, and the staining extended to a nearby drywell on the Property that was clogged.

49.     The Phase I report identified the presence of these abandoned drums as a recognized environmental condition that warranted further action and reported the condition to NYSDEC.

50.     After acquiring title to the Property on August 31, 2013, Plaintiff retained Fleming-Lee Shue, Inc. ("FLS"), an environmental management and consulting firm, to investigate and characterize the environmental conditions on the Property.

51.     FLS conducted an inspection of the Property on September 5, 2013. In its record of the inspection, FLS noted the presence on the Property of (a) the same drums described by the Velocity EP in the Phase I report; (b) the drywell in proximity to the drums; and (c) the "infiltration of unknown material" from the drums into the drywell. FLS further noted the presence of drums in the interior of the Property.

52.     On September 17, 2013, Plaintiff, FLS, and Brookside Environmental Contracting Services ("Brookside") conducted another site inspection to create an inventory of the drums.

53.     The materials contained within the drums were identified and characterized based on the labeling observed on the drums and various field tests of the materials, including tests for flammability and solubility.

54.     The inventory record shows that there were thirty-two drums of hazardous substances consisting of ethyl acetates, solvents, sludge, waste in acetic acid solution, and chromium oxide powder.

55.     These materials were broadly characterized as nail polish mixtures, lacquer thinner, and mineral oil, consistent with the types of waste associated with the cosmetics industry.

56.     During the same site inspection, Brookside observed a five hundred and fifty gallon UST on the Property containing approximately two hundred gallons of #2 Fuel Oil.

57.     New York State Petroleum Bulk Storage regulations require that a UST must be drained and cleaned of petroleum in order to be properly abandoned.  6 N.Y.C.R.R. § 613.9(b).

58.     Since the abandoned UST on the Property still contained petroleum, it was improperly abandoned.

59.     FLS's inspection of the clogged drywell in September 2013 revealed that the drywell was a Class V storm water drainage well receiving surface water runoff.

60.     A Class V storm water drainage well is a shallow on-site disposal system properly used to store and naturally filter non-hazardous storm water runoff below the land surface. 40 C.F.R. 144.80.

61.     Pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300 et seq., United States Environmental Protection Agency ("EPA") regulates Class V storm water drainage wells because such wells are a potential threat to underground sources of drinking water; accordingly, EPA implements the Class V Underground Injection Control Program ("Class V UIC Program"), which sets minimum standards to address the threats to drinking water posed by potential infiltration of hazardous substances through such wells. See EPA Class V Rule, 40 C.F.R. 9, 144-6.

62.     In New York State, the Class V UIC Program is administered by the EPA Region II Groundwater Compliance Section; the Nassau County Department of Health ("NCDOH") works directly with EPA Region II to implement the program in Nassau County.

63.     Brookside and FLS determined that the Class V storm water drainage well on the Property drained directly to groundwater and was constructed within the static groundwater table.

64.     As a result, the infiltration of material into the Class V storm water drainage well on the Property constituted direct contamination of the groundwater.

65.     Nassau County relies upon its groundwater as a source of drinking water. The groundwater aquifer underlying Nassau and Suffolk Counties has been designated as a Sole Source Aquifer under § 1424 of the Safe Drinking Water Act, meaning that the groundwater aquifer is the sole or principal drinking water source for the area and, if contaminated, would create significant hazard to public health. 42 U.S.C. § 300h-3(e), 43 Fed. Reg. 26,611 (June 21, 1978).

66.    The infiltration of materials known to be hazardous substances from the abandoned drums into the drywell posed a significant threat to Nassau County drinking water and to the public health.

67.    FLS contacted NYCDOH on behalf of Plaintiff to report the infiltration.

68.    In September 2013, NCDOH advised FLS and Plaintiff of the need to take an initial set of samples to assess whether and to what extent the soil surrounding the drywell was contaminated.

69.    On October 7, 2013, Brookside took soil samples in the area of the drywell. The samples were sent to a certified laboratory for analysis. The soil analytic results showed that the soil was contaminated with various chemical compounds considered to be hazardous substances, including volatile organic compounds ("VOCs") and heavy metals such as cadmium, lead, nickel, arsenic, and chromium.

70.    Plaintiff and Brookside reported the results of these samples to NCDOH.

71.    NCDOH and Brookside jointly scheduled an excavation of the area surrounding the drywell to a depth of six feet to take place on October 18, 2013. An NCDOH inspection of the property was scheduled on the same day.

### *Plaintiff's Response to Environmental Conditions on the Site*

72.    After the foregoing investigations and discussions, Plaintiff arranged for Brookside to begin to place the leaking drums in the courtyard into secondary containment.

73.    On October 9, 2013, Brookside began the process of transferring the leaking drums in the courtyard to new drums and over-packing the existing drums into larger drums.

74.     On October 18, 2013, a representative of NCDOH conducted an inspection of the Property. On the same date, as had been previously arranged, Brookside excavated the area of the drywell to a depth of six feet below ground surface ("First Excavation"), while representatives of NCDOH and FLS provided oversight.

75.     The NCDOH representative, noting the immediate threat posed by the environmental conditions on the property, advised in a report dated and provided to Plaintiff on October 21, 2013 that all drums on the property should be placed in secondary containment, and "all outdoor drum storage to be moved indoors immediately [*sic.*]."

76.     As directed by the NCDOH representative, Brookside placed the remaining drums in secondary containment and moved the drums indoors on October 21, 2013, where they were to remain until they could be properly disposed.

77.     On October 21, the NCDOH representative provided Plaintiff with the appropriate Nassau County registration form for the storage of hazardous and toxic materials and Plaintiff registered the drums with Nassau County.

78.     On October 29, 2013, Brookside removed the drums from the Property.

79.     Of the drums removed from the Property, thirty-two drums were shipped as hazardous waste to a licensed disposal facility (Cycle Chem Inc.) in New Jersey. Another forty-six drums were shipped offsite as non-hazardous waste, along with twenty-four empty drums.

80.     During the First Excavation, Brookside collected soil samples from the bottom of the excavation at six feet below ground surface to determine if further action was required.

81.     The soil samples were analyzed in a certified laboratory for VOCs, semi-volatile organic compounds ("SVOCs"), metals, pesticides and poly-chlorinated biphenyls ("PCBs").

82.     The soil analytic results were compared to NYSDEC Part 375 Unrestricted Use Soil Cleanup Objectives ("SCOs"), 6 N.Y.C.R.R. § 375-6.3. The comparison indicated exceedances in VOCs, SVOCs, metals (cadmium, lead, mercury, nickel, and zinc), pesticides, and PCBs.

83.     NCDOH collected confirmatory soil samples at the Property at the First Excavation and independently confirmed the soil analytic results.

84.     The results of the initial post-excavation sample were reviewed by a representative of the NCDOH who directed that a deeper excavation was needed to remove the contamination, based on the analytic results of their confirmatory soil samples.

85.     On the directive of the NCDOH representative, Brookside planned an additional excavation, this time to remove and replace the drywell entirely.

86.     On November 6, 2013, Plaintiff sought a permit from the Village of Freeport Department of Buildings ("DOB") to remove and replace the drywell in the Property's courtyard.

87.     On November 12, 2013, the Village of Freeport DOB issued the requested permit to Plaintiff for the removal and replacement of the drywell in the Property's courtyard.

88.     On the same day (November 12, 2013), Brookside removed the drywell and further excavated the area of the drywell to ten feet below ground ("Second Excavation"); the work was observed by representatives of NCDOH, FLS, and the Village of Freeport DOB.

89.     During this Second Excavation, Brookside encountered groundwater at eight feet below ground.

90.     The presence of groundwater at eight feet below ground confirmed the existence of a threat to drinking water and to the public health posed by the drums and the drywell contamination.

91.     Brookside collected new soil samples from the bottom of the excavated pit at ten feet below ground to determine if further action was required. These soil samples were analyzed at a certified laboratory for VOCs, SVOCs, PCBs, metals, and pesticides.

92.     The soil samples met standards of NYSDEC Unrestricted Use SCOs.

93.     NCDOH collected confirmatory soil samples at the Second Excavation and independently confirmed the soil analytic results.

94.     Brookside also collected groundwater samples at the Second Excavation, to determine if the groundwater had been impacted.

95.     The unfiltered groundwater samples were sent to a certified laboratory for analysis for VOCs, SVOCs, metals, pesticides, and PCBs.

96.     The analytic results were compared to NYSDEC Technical and Operational Guidance Series 1.1.1 (TOGS 1.1.1) Ambient Water Quality Standards and Guidance Values and Groundwater Effluent Limitations.

97.     The comparison showed that the unfiltered groundwater samples presented exceedances in metals and PCBs.

98.     The groundwater samples were then filtered for soil and sediment in accordance with applicable regulation and standard practice, and then rerun for metals and PCBs.

99.     The filtered samples showed no exceedances except for sodium, which was determined to be acceptable by a representative of NCDOH.

100.     Due to the soil and groundwater analytic results from the Second Excavation, the NCDOH representative concluded that no additional excavation was required.

101.    On November 15, 2013, Brookside installed a new drywell on the Property and backfilled the excavation from ten feet below ground to one foot below ground with pea gravel and from one foot below ground to the surface with recycled concrete aggregate blend.

102.    The drywell removal and replacement was performed in accordance with Class V storm water drainage well regulations, see EPA Class V Rule 40 C.F.R. 9, 144-6.

103.    On December 9, 2013, Brookside installed an asphalt patch above the clean fill surrounding the drywell.

104.    Plaintiff sought and received a Village of Freeport DOB permit to address the improperly abandoned UST on November 12, 2013.

105.    Plaintiff sought a NCDOH permit to address the improperly abandoned UST in November 2013. NCDOH issued a Tank Abandonment/Removal Form to Plaintiff on November 19, 2013, authorizing Plaintiff to fill the existing UST on the Property with concrete and abandon the UST in place.

106.    On November 19, 2013, Brookside drained the UST of fuel oil; the oil was pumped into drums for lawful recycling or disposal. The interior of the UST was fully cleaned and then completely filled with concrete in accordance with applicable law and regulations that permit the abandonment of a UST in place.

107.    On December 10, 2013, FLS sent a closure report to NCDOH and EPA detailing the work on the Property and recommending no further investigative or remedial action at the Property.

108.    On December 26, 2013, NCDOH verified that the UST on the Property had been filled with concrete and the fill and vent pipes had been properly removed, in accordance with applicable law and regulation.

15

109.    On December 27, 2013, after inspecting the Property, NCDOH sent a memorandum to EPA and NYSDEC detailing the work on the Property, and recommending no further investigative or remedial action at the Property.

110.    On January 2, 2014, EPA reviewed relevant documentation on the removal and response at the Property provided by FLS and NCDOH, found the documentation to be acceptable, and closed the file.

111.    On January 8, 2014, the Village of Freeport DOB issued a Certificate of Completion of replacement of the drywell in the Property's courtyard to Plaintiff, stating that the work had been "completed to the satisfaction of this Department."

112.    On January 13, 2014, NYSDEC reviewed relevant documentation on the removal and response at the Property provided by FLS, EPA, and the NCDOH, found the documentation to be acceptable, and closed Spill #1203757 on the Property.

113.    Plaintiff did not cause or contribute to the contamination at the Property.

114.    Outstanding costs for the investigation, response, and removal of hazardous substances on the Property totaled $74,343.27; these costs were borne entirely by Plaintiff and are hereinafter referred to as the "CERCLA Response Costs."

115.    Plaintiff's CERCLA Response Costs have been incurred in order to investigate and remove hazardous substances on the property that were released or posed a threat of release during Baroda's ownership and operation of the Property.

116.    Cleanup and response costs incurred due to the improperly abandoned UST and its petroleum contents on the Property amounted to $4,224.48. Costs to the Plaintiff in the form of attorney's fees amounted to $35,651.73. These costs were borne entirely by Plaintiff and are hereinafter referred to as "Non-CERCLA Response Costs and Damages."

117.    Plaintiff has notified Defendants of the investigation and response of the property, and has demanded that Defendants pay the CERCLA Response Costs and Non-CERCLA Response Costs and Damages in a letter dated January 31, 2014 that was transmitted via (i) facsimile on or about January 31, 2014 to the last known facsimile number for Baroda, (ii) certified mail and first-class mail on or about January 31, 2014 to the last known business address of Baroda, and (iii) hand delivery by a process server on November 15, 2014 to the home address of Kazi ("Demand Letter").

118.    The facsimile of the Demand Letter was successfully transmitted on January 31, 2014. The Demand Letter sent via certified mail was returned to Plaintiff on March 19, 2014 as unclaimed/refused.  The hand-delivered Demand Letter was successfully served on the wife of Kazi at his home address.

## FIRST CLAIM FOR RELIEF

### CERCLA – Cost Recovery

119.    Plaintiff repeats and realleges Paragraphs 1 through 118 of this Complaint as if set forth fully herein.

120.    CERCLA § 107(a)(1)-(4)(B) empowers "any . . . person" to recover "necessary costs of response" incurred "consistent with the national contingency plan," plus interest, "notwithstanding any other provision or rule of law."  42 U.S.C. §§ 9607(a)(1)-(4)(B).  In the event of (1) a release or threatened release, (2) from a facility, (3) of a hazardous substance, (4) which causes incurrence of response costs, persons incurring response costs can recover from any entity that falls within the four categories of parties deemed liable under CERCLA.  *Id.*

121.    The four classes of liable parties under CERCLA include: (1) the current owner or operator of a facility, (2) any person who owned or operated any facility at the time of disposal of hazardous substances, (3) any person who arranged for disposal or treatment of hazardous substances, and (4) any person who accepts hazardous substances.  42 U.S.C. §§ 9607(a)(1)-(4).

122.    "Hazardous substances" under CERCLA are listed at 40 C.F.R. § 302.4 and include substances that EPA has listed, or with respect to which EPA has taken action, under a variety of other environmental laws.  42 U.S.C. §§ 9601(14)(A), (C)-(F).

123.    The Property is a "facility" within the meaning of CERCLA § 101(9) because it is a place "where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).

124.    The contamination found on the Property and its individual chemical constituents are "hazardous substances" within the meaning of CERCLA § 101(14).  42 U.S.C. § 9601(14).

125.    Baroda is a "person" within the meaning of CERCLA § 101(21).  42 U.S.C. § 9601(21).

126.    Kazi is a "person" within the meaning of CERCLA § 101(21).  42 U.S.C. § 9601(21).

127.    Baroda was, at the time of the ongoing release of hazardous substances from improperly disposed drums on the Property, the owner of the Property.

128.    Baroda was, at the time of the ongoing release of hazardous substances from improperly disposed drums at the Property, the entity that managed, directed, and conducted operations at the Property, and therefore an "operator" within the meaning of CERCLA §§ 101(20)(A) and 107(a).  42 U.S.C. § 9601(20)(A); § 9607(a).

129.   Kazi was, at the time of the ongoing release of hazardous substances from improperly disposed drums at the Property, the person that managed, directed, and conducted operations at the Property, and therefore an "operator" within the meaning of CERCLA §§ 101(20)(A) and 107(a).  42 U.S.C. § 9601(20)(A); § 9607(a).

130.   There has been a "release" and/or "disposal" of hazardous substances at the Site within the meaning of CERCLA §§ 101(22) and 107(a).  42 U.S.C. §§ 9601(22); 9607(a).

131.   Plaintiff is a "person" within the meaning of CERCLA §§ 101(21) and 107(a).  42 U.S.C. §§ 9601(21); 9607(a).

132.   The release and disposal of hazardous substances at the Site have caused Plaintiff to incur necessary costs of response within the meaning of CERCLA §§ 101(25) and 107(a)(4)(B).  42 U.S.C. §§ 9601(25); 9607(a)(4)(B).

133.   Plaintiff has incurred approximately $114,343.27 in CERCLA Response Costs to date.

134.   All CERCLA Response Costs incurred and to be incurred by Plaintiff are consistent with the National Contingency Plan, 40 C.F.R. §§ 300, et seq.

135.   Baroda is therefore liable to Plaintiff, jointly and severally, for Plaintiff's CERCLA Response Costs, plus interest, in an amount to be determined at trial, pursuant to CERCLA § 107(a).  42 U.S.C. § 9607(a).

136.   Kazi is also therefore liable to Plaintiff, jointly and severally, for Plaintiff's CERCLA Response Costs, plus interest, in an amount to be determined at trial, pursuant to CERCLA § 107(a).  42 U.S.C. § 9607(a).

## SECOND CLAIM FOR RELIEF

### Indemnification

137. Plaintiff repeats and realleges Paragraphs 1 through 136 of this Complaint as if set forth fully herein.

138. In the event Plaintiff does not recover in whole or part on its First Claim for Relief, Plaintiff pleads in the alternative a cause of action for indemnification.

139. Defendants are aware that Plaintiff has incurred costs and expenses in response to the hazardous substances disposed of by Baroda' predecessors on the Property, and continually released throughout Defendants' ownership and/or operations of the Property.

140. Defendants are further aware that Plaintiff has incurred costs and expenses in response to the improperly abandoned UST and its contents, which were present on the Property throughout Defendants' ownership and/or operations of the Property.

141. Defendants owed a duty to remedy the harm resulting from the ongoing release of hazardous substances and improper abandonment of petroleum on the Property and caused by Defendants' inactions as a prior owner/operator of the Property.

142. Such duty included, but was not limited to, the obligation to remediate the Property such that it did not pose a threat to public health and/or the environment.

143. Defendants did not perform that duty.

144. Plaintiff has incurred costs in the course of taking actions to perform Defendants' duty to remediate the Property.

145. Defendants have received a benefit as a result of Plaintiff's actions to perform Defendants' duty insofar as Defendants should have borne the costs and expenses of such actions.

146. Plaintiff's costs of performing Defendants' continuing duty should be borne by Defendants.

147. Since Plaintiff has incurred costs that should be borne by Defendants, Defendants have been unjustly enriched at Plaintiffs' expense.

148. An injustice will result if Defendants do not reimburse and make Plaintiff whole for such costs.

149. Defendants are obligated to indemnify Plaintiff by law and by equity for all damages, costs and expenses that Plaintiff has incurred which are not recoverable under Plaintiff's First and Second Claims for Relief herein.

## THIRD CLAIM FOR RELIEF

### Restitution

150. Plaintiff repeats and realleges Paragraphs 1 through 149 of this Complaint as if set forth fully herein.

151. In the event Plaintiff does not recover in whole or part on its First or Second Claims for Relief, Plaintiff pleads in the alternative cause(s) of action for legal and/or equitable restitution.

152. Plaintiff has intended, and continues to intend to seek payment for all actions to taken to remediate the Property.

153. Plaintiff is entitled to restitution from Defendants of all damages, costs and expenses that Plaintiff has incurred, which are not recoverable under Plaintiff's First or Second Claims for Relief herein.

## PRAYER FOR RELIEF

WHEREFORE, upon all of the foregoing, Plaintiff seeks judgment against Defendants as follows:

i. Declaring Defendants liable to Plaintiff jointly and severally under CERCLA for CERCLA Response Costs plus interest;

ii. Ordering Defendants to pay Plaintiff recompense and damages in the amount of the CERCLA Response Costs, plus interest, pursuant to its CERCLA liability;

iii. In the alternative, declaring that Defendants are obligated to indemnify the Plaintiff by law and by equity for all damages, costs and expenses that Plaintiff has incurred that should have been borne by Defendants, and ordering Defendants to pay Plaintiff recompense and damages in the amount of the investigation and response costs not recoverable under CERCLA;

iv. In the further alternative, declaring Defendants liable in restitution for the investigation and response costs, and ordering Defendants to pay Plaintiff recompense and damages in the amount of the response costs pursuant to its liability in restitution or by indemnification for costs not recoverable under CERCLA; and

v. For such further relief as the Court deems just and proper.

Dated: New York, New York
January 30, 2015

Respectfully submitted,

SIVE, PAGET & RIESEL, P.C.

By: /s/ Mark A. Chertok
Mark A. Chertok
460 Park Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 421-2150
Facsimile: (212) 421-1891